J-A02011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.W., BIOLOGICAL | : | |
| MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 664 WDA 2019 |

Appeal from the Order Entered March 29, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-DP-0000080-2019

| | | |
|---|---|---|
| IN RE: R.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.W., BIOLOGICAL | : | |
| MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 816 WDA 2019 |

Appeal from the Order Entered March 29, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-DP-0000021-2019

BEFORE: SHOGAN, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.: **FILED MARCH 16, 2020**

L.W. ("Mother") appeals from the orders entered on March 29, 2019, that adjudicated her children, R.G., born in April 2011, and J.S., born in February 2014 (collectively, "Children"), dependent pursuant to section

6302(1) of the Juvenile Act, 42 Pa.C.S. § 6301, *et seq*.[1] After careful review,

we affirm. [2]

The trial court aptly summarized the facts adduced at the dependency

hearings, as follows:

> R.G., then age 7, and J.S., age 5, came to the attention of
> Allegheny County Children Youth and Families ("CYF" or "OCYF"
> [or "the agency"]) on October 30, 2018. This most recent referral
> on the family was reported to CYF and alleged concerns of medical
> neglect and inappropriate discipline. (Tr. 3/15/19 at 49). The CYF
> caseworker attempted multiple times to meet and discuss these
> allegations with Mother without any success. *Id*. The caseworker
> made an unannounced visit to Mother's residence and left a note
> in the door. *Id.* The caseworker also made phone calls to Mother.
> *Id*. When Mother returned some of the calls to the caseworker,
> Mother stated that she was refusing to meet with the agency and
> used obscene language, telling the caseworker "[that the
> caseworker was] not going to get into her home unless [the
> caseworker] take[s] her to court." *Id.* at 49 and 60–61. At the
> time of the filing of the petition, CYF had not been able to see the
> home or verify the safety of [Children]. *Id.*
>
> CYF filed a petition for dependency on January 8, 2019. At
> the pre-hearing conference for R.G.'s petition, the agency stated
> they just discovered that R.G. had a sibling, J.S., who also resided
> in the home, the child advocate expressed an inability to get into
> the home to see R.G. and also reported that R.G. had just
> expressed safety concerns. Due to the posture of the case, this
> [c]ourt ordered, *inter alia*, that CYF was to ensure that R.G. had
> a forensic evaluation that same day and CYF was to obtain an
> emergency custody authorization ("ECA") if . . . R.G. made
> disclosures of abuse. See Order of Court dated January 23, 2019
> —Pre-Hearing Conference Order.

---

[1] Mother filed separate appeals from each of these orders. The cases were consolidated *sua sponte* on June 17, 2019.

[2] R.A.G., the father of R.G., and Q.S., the father of J.S., did not appeal the adjudications, nor have they filed briefs in the instant appeals.

R.G. had a forensic evaluation at A Child's Place at Mercy [Hospital] on January 23, 2019[,] and when asked what happens when he gets in trouble, R.G. disclosed that "his mother is the one who gives him beatings and that she beats him on his arms, stomach, and back with her slipper. Per [R.G.] mother used to hit him with a belt but she does not anymore." See OCYF 2 - Information to Accompany Forensic Interview DVD at 2. During this forensic interview, R.G. also disclosed that he has had marks on his body in the past when his Mother hit him on his leg and head, that he has seen his Mother beat his sister, and that when he saw his mother in the courthouse she stated "'Why'd you tell my business?... Don't tell my business.'" *Id.* at 2. R.G. also made similar disclosures of Mother hitting him with the slipper and [with her] hand to another CYF caseworker assigned to the case. Tr. 3/15/19 at 71. CYF obtained an ECA for both R.G. and J.S. on January 25, 2019. A shelter hearing occurred on January 28, 2019[,] at which time both children were ordered to remain in care with their maternal aunt and Mother's contact to be supervised. See docket entries at DP-21-2019-018 and DP 80-2019-018; *see also* Shelter Court Care Order dated January 28, 2019 at DP 21-2019-018 and DP 80-2019-018.

As protocol when one child makes disclosures about a sibling's safety in a forensic interview, J.S. was then scheduled for a forensic interview at A Child's Place at Mercy, which occurred on February 22, 2019. See OCYF 1—Information to Accompany Forensic Interview DVD at page 1. In her forensic interview, J.S. indicated that her Mother has beat R.G. with a belt, flip flop, and a shoe, which made R.G. cry. *Id*. at 2. When asked what happens when she gets in trouble, J.S. disclosed that her Mother had "smacked me in the face" and that her Mother had hit and kicked her, showing a mark on her knee that J.S. claimed was from getting hit by mother. *Id*. J.S. also reported getting beat by Mother with a belt, which she described as having a "gold dangle and a black dangle." *Id.* J.S. said Mother hits both children until they cry and that she is smacked "a lot." *Id.* Additionally, J.S. denied feeling safe with her parents (specifically, Mother and her Father, Q.S.) because when they fight Q.S. will hit Mother in the face and they spit on each other. J.S. said that she and her brother get scared, and J.S. does not feel safe because "they are arguing all day." *Id.* CYF subsequently filed a petition for dependency on J.S., and filed an amended petition for dependency on R.G., with the adjudication hearings commencing on March 15,

2019[,] before this [c]ourt. See docket entries at DP 21-2019-018 and DP 80-2019-018.

At the adjudication hearing, the CYF caseworker testified that Mother began to communicate with her once court proceedings commenced and that Mother denied the use of any physical discipline. Tr. 3/15/19 at 61. The agency also reached out to J.S.'s Father, Q.S., and the caseworker stated that she attempted to visit his residence on three different occasions without any success. *Id.* at 50-51. J.S.'s Father, Q.S., did tell the caseworker that he was on probation and he had completed drug and alcohol and batterers' intervention programming while at Renewal in 2017. *Id.* at 52; *see also* Q.S. Exhibits A and B.

* * *

The caseworker also testified that there had been prior referrals to the family with allegations of mental health, domestic violence and medical concerns. Tr. 3/15/19 at 66. Also, the caseworker testified both a child protection services ("CPS") report and a general protection services ("GPS") report had been received after the original referral from October 2018. *Id.* at 67. With respect to those reports, the caseworker stated "nothing was indicated, nothing was founded. Everything was unfounded in regards to the CPS. Everything on the GPS side, we validated[,] meaning that we have concerns so, therefore, the case became open." *Id.* at 69.

Both R.G. and J.S. provided limited, *in camera* testimony at the adjudication proceedings sharing some parts of what had been disclosed in their forensic interviews, which was recorded on DVDs and introduced for this [c]ourt and all parties to watch as part of OCYF Exhibits 1 and 2, Information to accompany Forensic Interview DVD.

In addition to the CYF caseworker, CYF called the principal from Spring Hill Elementary School, Dr. Erin McClay, where R.G. had attended from Kindergarten through October 24, 2018. *Id.* at 81. Dr. McClay testified that there were significant issues with R.G.'s behavior in the school, specifically aggression towards other students, aggression towards staff members, and frequent elopements from the classroom where he would run through the hallways. *Id*. at 81-82. Dr. McClay testified that on September 26, 2018[,] the school held a meeting with an extensive group of professionals to try and address the behaviors,

including district officials, a special education teacher, the district behavior specialist, the special education counselor from Spring Hill Elementary, and Mother. *Id*. at 82. At that meeting, the individualized education plan ("IEP") team recommended to Mother that R.G. enter a partial hospitalization program through Mercy Behavioral Health to stabilize his behavior. *Id.* Mother initially agreed to the plan but later changed her mind indicating to the school that she was not open to R.G. being medicated. *Id.*

Dr. McClay testified that the school then held an internal multi-tiered system of support ("MTSS") meeting on October 16, 2018, which included a representative from Allegheny County Behavioral Health, in an effort to do a thorough review of R.G. and determine what support to provide. *Id.* at 85. Dr. McClay stated "this suggestion of going to Mercy Behavioral Health was kind of a last-ditch effort because we needed to—we needed to see whether it was his behavior inhibiting his learning or if he had some other issue causing him to, you know, not be able to succeed academically." *Id.* Dr. McClay testified that the school felt like they were "spinning our wheels" and that the representative from Allegheny County suggested perhaps it needed to be childlined as a neurological issue rather than a mental health issue. *Id*. While Dr. McClay had multiple observations of R.G.'s behavior becoming out of control, Dr. McClay also testified that she observed R.G. making movements like a "tremor or twitch, and sometimes, that became very violent that he, you know, wasn't able to control it." *Id.* at 92.

Dr. McClay expressed concerns about the school's inability to verify [M]other's residency, as sometimes they would send mail that would come back and sometimes it would not. *Id.* at 87. She testified that both she and the guidance counselor had previously tried to visit at [M]other's listed residence and no one ever answered the door or responded. *Id.* at 87-88. There were also concerns about R.G.'s attendance and number of unexcused absences in the fall. The school filed a truancy citation, which was ultimately resolved favorably for Mother. *Id.* at 88; Tr. 3/29/19 at 110. Dr. McClay also provided testimony that the school had a good working relationship with the Mother despite having to call Mother quite frequently as it related to R.G.'s behavior or disciplinary issues. *Id.* at 98; *see also* 98-100.

R.G.'s final day at Spring Hill was on October 24, 2018. *Id.* at 86. Dr. McClay testified that on that date, the school contacted

[M]other to let her know a physical management was conducted by a program officer, who is assigned to Spring Hill to support the teachers and who is trained in physical management. *Id.* at 104. Part of the protocol, when a physical restraint occurs, is to call and notify the parent. *Id.* When Mother was called, she threatened the program officer over the phone, resulting in Dr. McClay having to call the Pittsburgh Public School Police. *Id.* at 106. Heather Bellante, a special education teacher from Spring Hill, testified that she was present in the room when Mother was contacted about the physical management and that she could hear Mother screaming. *Id.* at 118. In reference to Mother, Ms. Bellante stated, "She said that she was coming up here and she was going to jail and no one was allowed to touch her son." *Id.*

Sara Gluzman, the forensic interviewer from A Child's Place at Mercy, testified with all parties stipulating to her qualifications as an expert in child forensic interviewing. Tr. 3-29-19 at 33. As it related to the credibility of R.G.'s disclosure in his forensic [interview], Ms. Gluzman testified that "just because a child may have a learning disability or may have trouble communicating doesn't automatically make them less credible, nor does it make them more suggestible. It might mean that they have trouble at school or trouble communicating, but that doesn't mean that they are not capable of coming in here and telling us something that somebody did to them." *Id.* at 39.

Dr. Jennifer Wolford, an attending physician in Children's Hospital of Pittsburgh division of Child Advocacy and the medical director of the CHECS[3] program, also testified as an expert in general pediatrics with a subspecialty in child abuse. *Id.* at 49.

---

[3] The transcript of 3-29-19 refers to Dr. Wolford as the "Director of the Checks program." The correct spelling of the program is CHECS, as seen in KV Exhibits AA and BB. CHECS stands for Child Health Evaluation Coordination Services and is a collaborative program between Allegheny County Children Youth and Families and the Children's Hospital Child Advocacy Center to provide coordination of care and summary of medical records.

---

Largely, Dr. Wolford testified about the medical review of all of the records available to them through Children's Hospital for R.G. and J.S. which were documented in the CHECS medical case review.

See KV Exhibit AA and BB. Dr. Wolford expressed concerns that there appeared to be some lapses in follow up and missed appointments when it came to R.G.'s neurological and gastroenterology appointments from 2017 until CYF's recent involvement. Tr. 3-29-19 at 50-51. Dr. Wolford indicated that R.G. had abnormal EEGs and was recommended to be on medication. *Id.* Dr. Wolford stated that since 2017 there were multiple missed follow up appointments with neurology. *Id.* She continued that there was also a period of time where there was no appointments attended at the Child Development Unit to address R.G.'s diagnosis of autism and ADHD. *Id*. Dr. Wolford stated that R.G. also needed follow up care with gastroenterology due to his difficulty with constipation. *Id.* Dr. Wolford indicated that since CYF had become involved with the family they were able to reestablish care and schedule appointments with the sub-specialists. In addition to Dr. Wolford's testimony, this summary and documentation of no-show appointments and follow up care were fully detailed for both R.G. and J.S. in the CHECS Medical Case Review, entered into evidence. *Id*; *see also* KV Exhibit AA and BB. While [M]other reported that she had discontinued R.G.'s medication and was addressing his issues with other medical personnel, Mother failed to present these medical personnel or supporting evidence, other than her own testimony, to support this proposition. *See* Tr. 3/15/19 and 3/29/19, in their entirety.

J.S.'s Father, Q.S., stipulated to some of the facts within the dependency petition. Tr. 3/15/19 at 7-10. He stipulated that his daughter J.S. had a forensic evaluation on February 21, 2019[,] and that J.S. made disclosures but he would not agree that those are true and accurate, instead stating that he never hit [Children]. *Id.* at 8. Q.S. also was "willing to stipulate that there has been arguing, domestic violence issues in the past, that there have been three, not four, police records detailing domestic violence incidents from the years 2016-2018 ... that they had both filed PFAs at certain times with the clarification that the PFA that he filed on September 4th, 2018[,] was regarding an incident where [Mother] took his car ... and the police advised him to file a PFA but there were no allegations of physical abuse in that PFA." *Id.* at 8-9.

* * *

With respect to the domestic violence concerns, Q.S. contended that there was arguing between he and Mother but no physical abuse. *Id.* at 32-33. Q.S. denied spending substantial

amounts of time in the home with Mother, despite being married, because he is required to stay at his grandmother's address for probation purposes. *Id.* at 140. Q.S. admitted that a part of his criminal history included a simple assault charge and endangering the welfare of a child due to an incident with the mother of his other children in 2014. *Id.* at 142-143. Q.S. also admitted that he had been charged with simple assault in March 2016 where Mother was the victim and which resulted in returning before his criminal court judge of record for a violation of probation hearing. *Id.* at 151. Q.S. was required to do another batterers' intervention program, placed on house arrest for three months, and was ordered to not have contact with Mother. *Id.* at 152. Q.S. did complete that round of batterers' intervention classes in 2017 and stated he has been compliant with his probation since that time. *Id.*

Mother testified that in the 2018-19 school year, leading up to the incident on October 2[4], 201[8], that she was called "daily" by Spring Hill Elementary due to concerns about R.G.'s "behavior." Tr. 3/29/19 at 9. Mother stated that she didn't follow up with the Merck clinic[4] because "the appointments were too far out" and so she reached out to a private doctor, Dr. Hartman. *Id.* at 114. Mother testified that she took R.G. to see Dr. Hartman three times. *Id.* Mother admitted that Dr. Hartman had recommended three hours of wrap around services a week and service coordination for R.G. but that she did not follow through, instead just sharing the evaluation with the school officials. *Id.* at 125-126.

> [4] The "Merck clinic" is the Merck Child and Adolescent Clinic, located in Pittsburgh, Pennsylvania. The Merck clinic specializes in assessment and treatment of children and adolescents who have autism spectrum disorder, children with developmental disabilities, and children who [have] co-occurring psychiatric and/or behavioral disorders.

With respect [to] R.G.'s medication, Mother claimed that after she took R.G. to see his pediatrician on or about December 17, 2017[,] that she stopped giving R.G. his prescribed medication. *Id.* at 24-25. Mother also reported that she had taken R.G. to see his pediatrician for issues with constipation and acid reflux, for which he was given Zantac and Miralax. *Id.* at 25 and 107. Mother claimed she didn't take R.G. to his neurology

appointment on November 15, 2017[,] because "he was seen at Children's Hospital emergency room two months prior to that." *Id.* at 28. Mother also testified that she did not take R.G. to a neurology appointment on December 10, 2018[,] that was scheduled by [M]other and Spring Hill Elementary because "he was long gone from Spring Hill School. I asked Manchester [Elementary] if they felt as though this appointment, it was necessary, and they said they weren't having any concerns with him at that time.["] *Id.* Additionally, Mother stated she was currently working on obtaining an eye exam for R.G. to replace his broken glasses. *Id.* at 106.

Mother denied threatening anyone at Spring Hill Elementary when she was called on October 2[4], 2018[,] by the school. *Id.* at 13. Mother stated that after this incident, she enrolled R.G. in Manchester Elementary, where he attended for two months, and from there transferred him to Langley. *Id.* at 14-15. Mother also testified that she also filed a complaint with the Board of Education and the Department of Education about the physical restraint, and Mother testified that she believed the school reported concerns about his lack of medication to CYF as retaliation. *Id.* at 16.

Mother denied physically maltreating R.G. and J.S. *Id.* 116-117. She stated that R.G. may have talked about "beating or getting beaten" because that was how she was raised, and it was a term used in reference to discipline but that she did not actually beat him. *Id.* at 117. Mother refuted the disclosures that she had used a belt on [Children] and claimed she has "never owned a belt." *Id.* at 118 and 120. Mother also testified that she only spanked R.G. by tapping him on his arm or leg. *Id.* Mother also refuted [Children's] disclosures that she had used a flip-flop or slipper to beat them. *Id.* at 119.

With respect to the allegations of domestic violence with J.S.'s father, Q.S., Mother testified that there had been "arguments and disputes between us in the past, but never physical." *Id.* at 126. Mother also contradicted herself indicating that [Children] had not been present during the disputes but then admitting that J.S. had been present for one. *Id*. at 126. When asked whether she was denying the police reports where she had reported physical encounters with Q.S., in March 2016 and September 2018, Mother stated, "Whatever I was feeling at that time when we were going through that situation, I could have handle (sic) it differently. I don't know why, you know, whatever

I was thinking, but it was never physical between me and [Q.S.]."
*Id.* at 127. When asked whether her testimony was that she
reported an assault by Q.S. to the police even though there was
no actual assault, Mother stated, "Well, no. I stated that whatever
I was feeling at that time to make me feel—you know, whatever
we went through or whatever happened at that time, I'm not
saying there wasn't an assault. What I'm saying is, you know, it
was never really actually physical. So whatever happened at that
time, that, you know, that's how I felt of the situation." *Id.* at
130.

At the time of the petition hearing, Mother stated she was
currently taking classes at the Women's Center and Shelter, as
recommended by the CYF caseworker. *Id.* at 111. Mother stated
that she was also following up with the behavioral treatment that
was recommended by Children's Hospital. *Id.* at 115. Mother also
presented two witnesses who testified that they had never seen
her inappropriately discipline her children. Tr. 3/15/19 at 157-
166.

Trial Court Opinion, 8/13/19, at 2–17 (some footnotes omitted).

At the conclusion of the hearing, the court adjudicated Children
dependent. Mother timely filed notices of appeal and statements of errors
complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1. Did the trial court commit an error of law and abuse its
discretion by determining that Mother has not adequately
provided for [Children's] medical needs where the uncontradicted
evidence indicates that R.G. has neurological, gastroenterological
(from birth), and behavioral issues, that he sees a number of
different medical professionals, that his medical history shows
that Mother has repeated[ly] taken him to the Emergency
Department and his pediatrician for repeated ENT, gastro- and
neurological issues, that J.S. has endocrinological issues requiring
numerous visits with specialists, that R.G. has an IEP and has had
constant problems at school requiring his mother to be in almost
daily contact with school staff, and that uncontradicted evidence
indicates [Children] are up to date on immunizations and regularly
[see] their PCP, all suggesting that Mother's inability to get R.G.

- 10 -

to a few of a multitude of medical appointments did not constitute medical neglect[?]

2. Did the trial court commit an error of law and an abuse of discretion in finding that Mother physically abused [Children] given that (a) [Children] were interviewed in a manner likely to elicit coached responses; (b) neither school nor medical staff ever raised concerns that [Children] had been abused; (c) the belt incident allegedly occurred over a year prior to the hearing, with no evidence of more recent abuse; (d) no medical or other physical evidence substantiates the abuse allegations; (e) an OCYF employee testified that she did not observe [Children] express fear of [M]other; (e) [*sic*] the allegations emanated from R.G., when he was in second grade, has an IEP, is autistic, has learning disabilities, has significant behavioral issues; (f) where R.G. provided no time frame about when the alleged abuse occurred, did not specify the number of occurrences or the severity of the alleged strikes, and did not offer any other details which would tend to corroborate [R.G.'s] narrative; and (g) and witnesses contradicted reports of abuse[?]

3. Did the trial court commit an error of law or abuse its discretion by failing to acknowledge the issue of retaliation by the Spring Hill Elementary School, resulting from Mother's state and federal complaints against the school, which retaliation took the form of contacting OCYF after [R.G.] was removed from his school by Mother and misinforming them that Mother had been educationally and medically neglectful to R.G. and by asserting that Mother had been resistant to interventions proposed by the school staff, when, to the contrary, Mother had been highly involved in [R.G.'s] difficult educational situation?

4.[3] Did the trial court commit an error of law and an abuse of discretion in holding that J.S. is "dependent" in light of the evidence that the Mother has done everything asked of her, particularly given her compliance with requirements imposed on her by the Home Builder's program and programs including Pressley Ridge?

_____

[3] Mother's Statement of Questions Involved omits issue number four; we have renumbered her subsequent issues for ease of analysis.

5. Did the trial court commit an error of law and abuse its discretion by making a finding of continued dependency as to [Children], although it failed to set forth specific, feasible, realistic, or attainable goals for [Children's] permanency plan and failed to set the likely date on which [Children's] placement goals could be achieved?

6. Did the trial court commit an error of law and abuse its discretion in entering a disposition that requires that all of Mother's custodial time with [Children] be supervised when such a restriction was not appropriate or necessary to ensure the safety of J.S.?

7. Did the trial court commit an error of law and abuse its discretion by removing J.S. from the home when the only allegations of physical abuse and/or medical neglect related to R.G.?

8. Did the trial court commit an error of law and abuse of discretion when it permitted Dr. Wolford to testify as to her opinion about a relationship between R.G.'s intestinal issues and stress/abuse when she had not provided a foundation for such an opinion nor provided any expert report on which to base her opinion?

9. Did the trial court commit an error of law and abuse of discretion in finding that [Children] were dependent absent clear and convincing evidence of dependency, when the decision of the trial court was contrary to the weight of the evidence, and where the trial court's findings are unsupported by the evidence of record[?]

Mother's Brief at 4-6 (suggested answers omitted) (emphasis in original).

The standard of review in dependency cases

requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73–74 (Pa. Super. 2004) (quotation omitted). Additionally, the admission of evidence is within the purview of the trial court's discretion. *In re C.M.T.*, 861 A.2d 348, 355 (Pa. Super. 2004).

"The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *In re G.,T.*, 845 A.2d 870, 872 (Pa. Super. 2004) (citation omitted). Section 6302 of the Juvenile Act defines a "dependent child" as a child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1). "The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available." *G.,T.*, 845 A.2d at 872 (quotation omitted).

We have further noted:

> [w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In the Interest of K.C.*, 903 A.2d 12, 14–15 (Pa. Super. 2006) (some citations omitted). Accordingly, when the court removes a child from his or her home, the Rules of Juvenile Court Procedure provide that the court must determine whether "the child's placement is the least restrictive placement that meets the needs of the child, supported by reasons why there are no less restrictive alternatives available[.]" Pa.R.J.C.P. 1242(C)(3)(c); *see also* Pa.R.J.C.P. 1514(A)(2).

> During a child's dependency,
>
> [t]he standard against which visitation is measured . . . depends upon the goal mandated in the family service plan. Where . . . reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If . . . the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children.

*In the Interest of C.B. and A.L.*, 861 A.2d 287, 293 (Pa. Super. 2004) (quoting *In re B.G.*, 774 A.2d 757, 760 (Pa. Super 2001)).

Prior to addressing the merits of Mother's issues, we must first determine whether they have been preserved for purposes of appeal. *See Commonwealth v. Wholaver*, 903 A.2d 1178, 1184 (Pa. 2006) (observing

- 14 -

that this Court may *sua sponte* determine whether issues have been properly preserved for appeal).

Initially, we note that pursuant to Pa.R.A.P. 903, Mother had until April 29, 2019 to file an appeal.[4] Mother's notice of appeal at 664 WDA 2019 was docketed on April 30, 2019. In response to a rule to show cause why the appeal should not be quashed, Mother's counsel responded that on Monday, April 29, 2019, counsel's staff had tried to file the documents via PACfile, but the system was not allowing uploads. **See** Rule to Show Cause, 7/25/19, at 1; Response to Rule to Show Cause, 8/8/19, at 1. Counsel averred that the delay was not of her doing; the delay was minimal; and that allowing the matter to proceed was the best use of judicial resources. **Id.** We acknowledge that the notice of appeal, docketed one day after the expiration date, was filed late as a result of non-negligent circumstances. As no party avers prejudice, we decline to quash the appeal. **See Criss v. Wise**, 781 A.2d 1156, 1159 (Pa. 2001) (if counsel's failure to timely file an appeal is due to non-negligent circumstances, appellant should not lose his day in court).

Mother's first issue avers that the trial court erred in making a finding of medical neglect. Mother asserts that the testimony concerning missed medical appointments must be viewed in the context of R.G.'s myriad of

---

[4] Although the trial court entered its order on March 29, 2019, the thirtieth day of the appeal period fell on Sunday, April 28, 2019. **See** 1 Pa.C.S. § 1908 (noting that the computation of time excludes the first and last day of a period, and that when the last day of a period falls on a Saturday, Sunday, or legal holiday, that day may be omitted from computation). Mother did timely file a notice of appeal at 816 WDA 2019.

physical and mental health issues and the time she devotes to addressing those concerns with various medical professionals. Mother protests that "given the barrage of appointments in this case, the small proportion missed by Mother hardly rises to the level of medical neglect so as to result in the removal of these two children from their parent." Mother's Brief at 18.

In order to ascertain whether the trial court erred in this regard, we deem it prudent to recount in full its rationale for concluding that R.G. and J.S. were without proper parental care or control:

> Without question, the record is replete with evidence and testimony supporting the adjudication of dependency pursuant [to] § 6302(1). This [c]ourt found [Children] and the forensic evaluator credible. There was no doubt in this [c]ourt's mind that these children were subject to inappropriate physical discipline and were fearful while in the care of Mother and Q.S. due to the nature of the parents' relationship.[6] The Order of Adjudication and Disposition for [R.G.] and J.S., both dated March 29, 2019, included extensive findings detailing how the sum total of the testimony clearly and convincingly supported an adjudication of dependency. . . .
>
> > [6] This [c]ourt did not mak[e] a finding of physical abuse in the Order of Adjudication and Disposition for either R.G. or J.S.
>
> Mother and Q.S. lacked credibility when it came to their testimony about the alleged intimate partner violence in their relationship. Q.S.'s testimony that he only filed for a temporary Protection from Abuse order from Mother because she took his car did not make sense. Mother's testimony that acknowledged there were police reports she initiated alleging abuse but that physical contact did not occur also did not make sense. This [c]ourt's observation was that both Mother and [Q.S.] appeared to want to downplay the potential explosive nature of their relationship and the impact it had on their children.

Also factoring into this [c]ourt's consideration was that despite Q.S. completing prior batterers' intervention classes while involved with the criminal justice system, Q.S. and Mother continued to have episodes where the police were called, including one that gave rise to a violation of probation for Q.S., where he was placed on house arrest and ordered to stay away from Mother until he completed yet another round of batterers' intervention classes by his criminal court judge.

This [c]ourt also gave significant weight to the disclosures that [Children] made at their forensic evaluations, which were entered into evidence in DVD by CYF and viewed by this [c]ourt and all parties, which clearly depicted both children disclosing inappropriate physical discipline and expressing safety concerns at home.

This court also considered [Children's] positions, which were advanced by their court appointed Guardian *ad Litem*. The Guardian *ad Litem* for R.G. and J.S. indicated on the record that she had the ability to meet several times with [Children], both together and separately, in various locations. In advancing the position of [Children], the Guardian *ad Litem* stated, "[Children] have been consistent with their position that they are fearful of being home due to the inappropriate physical discipline and the arguments that they see between [M]other and Q.S. They have indicated that they feel safe with their aunt. They–when asked, you know, about where they want to live and returning to [M]other's home, they tell me [M]other has said, We are going home. Mother tells me to tell you that I want to go home or the strangers are going to put me somewhere bad. [Children] have never indicated that they personally wish to come home, only that they have been told to tell me that. They report being cared for in the aunt's care and being happy and safe there."

Mother sought to blame the court proceedings and CYF investigation on a retaliatory report by R.G.'s school after an incident on October 25, 2018. This [c]ourt did not factor in whether or not Mother and Spring Hill Elementary's relationship had soured after the incident on October 25, 2018. What this [c]ourt did consider, however, was that the collective testimony of both Mother and Spring Hill indicated that R.G. was in a downward spiral, significantly struggling in the school setting that Mother was regularly called, and with behavior so out of control that the school sought to have R.G. admitted into a 30 day partial

hospitalization program to provide immediate stabilization. Mother, who initially agreed to the partial hospitalization and ultimately rescinded permission because she did not want R.G. to be medicated, was well within her rights as a parent to decide to not medicate her son. Nonetheless, it was extremely concerning to this [c]ourt that Mother was unable to provide any evidence to demonstrate how she was otherwise meeting R.G.'s immediate need for intensive intervention and behavioral stabilization. Mother[] testified that she had taken R.G. three times to a "Dr. Hartman" and testified that she shared that evaluation and recommendations with the school. However, Mother did not follow up personally on any of the alleged recommendations in the report, which was never presented to this [c]ourt for review. Mother cannot merely discharge her duty to provide proper parental care and control necessary for R.G.'s educational and mental well-being by placing the bulk of the responsibility on the school. Mother was also unable to adequately explain R.G.'s lapse in sub-specialty services, as testified to by Dr. Wolford and documented in KV Exhibit AA, from approximately 2017 until CYF became involved and filed dependency petitions in January 2019. Based only on Mother's testimony, as no other evidence or witnesses were presented to support this proposition, Mother claimed that during this window of time she was addressing R.G.'s needs with visits to the pediatrician and the occasional emergency room visit. Even if this was true, this evidence and testimony before this [c]ourt would suggest that Mother's course of action was woefully inadequate to address the significant issues R.G. was experiencing in the school setting, whereby Mother's own testimony was that she was getting called "daily" because of his behavior.

Trial Court Opinion, 8/13/19, at 21–25 (internal citations to the record omitted).

As the above excerpt discloses, the trial court never utilized the term "medical neglect" in its description of Mother's behavior. Rather, the trial court's dependency adjudication was reasoned primarily upon the testimonies of the GAL and Children regarding the inappropriate physical discipline meted out by Mother and Children's fear for their safety in the home occupied by

Mother and Q.S. Nonetheless, while the trial court agreed with Mother that she was "well within her rights as a parent to decide to not medicate her son," citing the missed appointments with the subspecialists, the trial court registered its concern that Mother could not produce evidence that she was addressing R.G.'s significant needs and described her course of action in this regard as "woefully inadequate." Trial Court Opinion, 8/13/19, at 24–25.

This Court has defined "proper parental control" as "care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re M.B.*, 101 A.3d 124, 128 (Pa. Super. 2014). In *M.B.*, this Court decided that the trial court did not abuse its discretion when it adjudicated a child dependent when that child had "particular needs related to his mental health" but the "record does not demonstrate that Mother has made any attempts to provide [c]hild with any care designed to treat his mental health conditions." *Id.* at 128. We found that the trial court determined, by clear and convincing evidence, that Mother put her child at risk when she "was unable to ensure that [c]hild took the medication as prescribed" and "did not take [c]hild to a specialist or mental health professional for follow-up care." *Id.*

In this case, it is undisputed that Mother missed a number of neurology and gastrointestinal appointments for R.G. Dr. Wolford stated that Mother's failure to follow up with the neurology subspecialists was particularly concerning because "the most important part of a child's body is the brain,"

and "any medical attention or therapeutic intervention to maximize the child's growing brain potential is critically important." N.T., 3/29/19, at 675.

Mother's inattention to the subspecialists' appointments represented a failure to adequately treat R.G.'s medical issues that cannot be excused by other efforts Mother may have taken to address his conditions. Thus, the trial court's reference to Mother's laxity in determining that R.G. was without proper parental care was not an abuse of discretion.[5]

Mother's second issue challenges the trial court's finding of physical abuse. However, the trial court did not find that Mother physically abused Children. Trial Court Opinion, 8/13/19, at 21 n.6. No further discussion is required.

In Mother's third issue, she argues that the court erred in failing to acknowledge the "issue of retaliation by the Spring Hill Elementary School." Mother's Brief at 37. Mother avers that the trial court improperly overlooked

---

[5]    Although the trial court noted that documentation of J.S.'s missed appointments was admitted into evidence, *see* Trial Court Opinion, 8/13/19, at 11, it  did not discuss or reach any conclusion regarding Mother's efforts to pursue medical services for J.S.  Mother's discussion of the alleged medical neglect of J.S. is limited. Mother admits that J.S. missed an appointment with an endocrinologist, but offers that J.S. was seen at the hospital for painful urination. Mother's Brief at 16.  She also claimed in her testimony that J.S. had been seen by both a dentist and an eye doctor. *Id.* at 22; N.T., 3/29/19, at 106. Because the trial court did not factor Mother's response to J.S.'s medical needs in its dependency adjudication, and because Mother did not develop any argument concerning J.S. in this context, the issue of medical neglect of J.S. is waived. *See Commonwealth v. Treiber*, 121 A.3d 423, 474 (Pa. 2015) (cursory allegations are waived for failure to develop an argument).

her claim that the school contacted CYF as retaliation for Mother's filing complaints with the federal and state Boards of Education. *Id.*

Initially, we note that the Rules of Appellate Procedure indicate that an appellant's brief must contain an argument section and citations to the pertinent authority. *See* Pa.R.A.P. 2111(a)(8); Pa.R.A.P. 2119(b). An appellant's failure to support each issue raised by discussion and analysis of pertinent authority hampers this Court's review and risks waiver. *Thomas v. Thomas*, 194 A.3d 220, 229 (Pa. Super. 2018). Here, Mother cites no case law in support of this argument and, accordingly, risks waiver of the issue. *Thomas*, 194 A.3d at 229.

Regardless, Mother's issue is without merit. The trial court, in its opinion, noted that it did not consider whether Mother's relationship with the school soured after the October 24, 2018 incident but instead, relied on evidence from both Mother and the school that R.G. was in a downward spiral at the school. Trial Court Opinion, 8/13/19, at 24. Furthermore, there was no evidence introduced to show that the school contacted CYF in retaliation for Mother's complaints beyond Mother's own testimony. It is entirely within the trial court's purview to weigh the evidence and make credibility determinations and we decline to re-weigh the evidence. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

We address Mother's fourth, seventh, and ninth issues together, as they are interrelated. Therein, Mother argues that the trial court committed an error of law and an abuse of discretion in adjudicating Children dependent

absent clear and convincing evidence of dependency. Mother further claims that the dependency finding was against the weight of the evidence and unsupported by the record. Mother's Brief at 53–58. Specifically, in her seventh issue, Mother contends that the court erred in adjudicating J.S. dependent because Mother had done everything asked of her since the inception of the case, the trial court made no findings that Mother was not in compliance, and the allegations of abuse related only to R.G., and not to J.S. Mother's Brief at 41, 46–48.

The burden of proof is on the agency to demonstrate by clear and convincing evidence that Children are lacking proper care or control. *See* 42 Pa.C.S. § 6302; *In re G.,T.*, 845 A.2d 870, 872 (Pa. Super. 2004). We have detailed, *supra*, the trial court's rationale for adjudicating Children dependent and we see no error in its recital of the facts supporting its decision or in its legal reasoning.

The record supported the conclusion that R.G. and J.S. had been subjected to inappropriate physical discipline. Both children made disclosures that they had been hit with slippers, shoes, or belts; both children indicated that they did not feel safe in the home, and the trial court found their accounts credible. The record supported the conclusion that Mother had not ensured that R.G. had appropriate medical care for his numerous physical, psychological, and neurological issues until after the filing of the dependency petitions and the adjudication. Similarly, Mother appeared not to understand that taking R.G. to the emergency room was not the same as establishing care

with a subspecialist, and Mother appeared to be continuing the pattern with J.S. Additionally, the record supported the conclusion that both Mother and Q.S. continued to minimize the mutual domestic violence in the home, with Mother equivocating about police reports she had filed alleging physical abuse, and Q.S. similarly minimizing the PFAs he had filed against Mother. Accordingly, it was appropriate for the court, in considering the best interests of Children, to find that they were without proper parental care and control and adjudicate them dependent. **See G.,T.**, 845 A.2d at 872.

Mother's fifth issue assails the trial court's finding of continued dependency for failure to set forth a target date for Mother to comply with CYF directives geared to enable Children's return to Mother. Mother's argument in this regard is confusing as it could appear by her use of the term "continued dependency," and her citation to 42 Pa.C.S. § 6351 (e) and (f) that Mother is challenging the trial court's permanency review order of May 28, 2019, which is not a part of this appeal. However, in her argument, Mother refers only to the contents of the March 29, 2019 dependency order, which clearly is not a permanency review order. As Mother has failed to advance a cogent argument concerning deficiencies in the March 29, 2019 order of adjudication and disposition, she has waived appellate review of this issue. **See Lackner v. Glosser**, 892 A.2d 21, 29 (Pa. Super. 2006) (explaining that arguments which are not appropriately developed are waived).

Mother's sixth issue charges error in the trial court's decision to order that Mother's visitation with J.S. must be supervised.[6] "The polestar and paramount concern in evaluating parental visitation, in dependency as well as non-dependency situations, is the best interests and welfare of the children." *In re C.J.*, 729 A.2d 89, 94 (Pa. Super. 1999) (citations omitted).

We have already discussed the trial court's findings that Mother inappropriately disciplined Children and that Children felt unsafe in her care. Thus, requiring that Mother's visitations be supervised until she complied with the parenting services was clearly in Children's best interests and best suited to their protection and physical, mental and moral welfare. *See In re A.B.*, 19 A.3d 1084, 1089 (Pa. Super. 2011) (citations and quotation marks omitted) ("The best interests of the child, and not the interests of the parent, must guide the trial court.").

Mother's eighth issue contends that the court erred in allowing Dr. Wolford to testify to her opinion regarding the link between intestinal issues and mental stress without providing a foundation or expert report. Mother's Brief at 4–6. Dr. Wolford had not submitted an expert report at the time of the hearing, but Mother did not object to Dr. Wolford's qualification as an expert witness in pediatrics with a subspecialty in child abuse. N.T.,

---

[6] We do not agree with the GAL's position that this issue is waived. At the conclusion of the March 29, 2019 hearing, Mother specifically asked the trial court why visitation had to be supervised. N.T., 3/29/19, at 157. The trial court explained that visitations would be supervised until the services recommended for Mother were in place and that the necessity of supervised visitation would be re-visited at a later hearing. *Id.* at 157–158.

- 24 -

3/29/19, at 49. She has thus waived any challenge to Dr. Wolford's expert testimony without a prepared report. **See** Pa.R.A.P. 302. We will, however, briefly address Mother's challenge to the substance of Dr. Wolford's expert testimony.

Mother contends that the trial court erred in permitting Dr. Wolford to opine concerning a link between R.G.'s gastrointestinal issues and stress. Mother's Brief at 48-49. We reject this contention of error. First, the trial court noted that it "did not consider the testimony speculating that R.G.'s gastrointestinal issues were related to the allegations of inappropriate physical discipline." Trial Court Opinion, 8/13/19, at 18 n.5. Second, as noted, Mother did not object to Dr. Wolford's qualification as an expert in general pediatrics with a subspecialty in child abuse. Finally, the question about the possible connection between maltreatment and intestinal issues was posed as a hypothetical, and not specifically geared to R.G.'s medical condition. N.T., 3/29/19, at 59. Accordingly, the court did not abuse its discretion in regards to this testimony.

For all these reasons, we conclude that the trial court did not abuse its discretion in adjudging R.G. and J.S. dependent. Accordingly, we affirm the orders of adjudication and disposition.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/16/2020</u>